## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SEAN OWENS, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CASE NO. 17-CV-1719-G-BK |
| | § | |
| NEOVIA LOGISTICS, LLC, | § | |
| DEFENDANT. | § | |

## FINDINGS CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b) and the District Judge's *Standing Order of Reference*, Doc. 64, this case has been referred to the United States Magistrate Judge for pretrial management. The Court now considers the parties' cross-motions for summary judgment, Doc. 81 & Doc. 97. For the reasons discussed below, Plaintiff's summary judgment motion should be **DENIED**, and Defendant's summary judgment motion should be **GRANTED**.

**A.     Procedural History**

In this case, brought under the Fair Labor Standards Act ("FLSA"), Plaintiff alleges that Defendant, his former employer, illegally misclassified him as an exempt employee not covered by FLSA and failed to pay him overtime wages.[1] Defendant takes the position that Plaintiff was an exempt administrative employee and thus not entitled to overtime pay. The parties cross-moved for summary judgment, Doc. 81 & Doc. 97, and, thereafter, Plaintiff filed a motion seeking Rule 11 sanctions against Defendant. Doc. 112.

_____

[1] Plaintiff was represented by counsel at the time he filed the operative amended complaint, but is now proceeding *pro se*.

B.      **Factual Background**

Defendant is in the business of providing logistics services to its clients.  Doc. 99 at 40

(Deft. Decl. of Maria Olson).[2]  Specifically, Defendant markets "Continuous Improvement"

solutions to its clients and potential clients to help them find cost savings in logistics operations,

including through increased efficiency of facility operations and processes.  Doc. 99 at 40-41

(Olson Decl.).

In January 2015, Plaintiff began working for Defendant as a Continuous Improvement

Supervisor.  Doc. 99 at 41 (Olson Decl.).  Defendant's description of the position noted that:  (1)

the job entailed functioning as a project leader who would lead Defendant's continuous

improvement projects: (2) the essential functions of the job included being a subject matter

expert, as well as training and leading workshops; (3) a bachelor's degree and

management/supervisory experience were required; and (4) the position required travel 50

percent of the time, as well as frequent walking, carrying, reaching, standing, and stooping, in

addition to lifting and moving items of various weight and working from a height of up to 20

feet.  Doc. 99 at 51 (Deft. job description).

Plaintiff's offer letter, which he signed, stated that his "base salary on an annualized basis

will be $85,000."  Doc. 99 at 46-49 (Offer Letter).  Plaintiff testified in his deposition that when

he started his job, he asked a human resources employee whether he qualified for overtime pay,

and she said she "didn't think so."  Doc. 99 at 36 (Owens Dep.).  Thereafter, he spoke to various

_____

[2] Olson is a Senior Director of Operations Excellence for Defendant, and she was Plaintiff's
direct supervisor from the time he was employed in January 2015 through part of 2016.  Doc. 99
at 40 (Olson Decl.).  Olson also had the same job duties as Plaintiff earlier in her career.  Doc. 99
at 40 (Olson Decl.).

managers and human resources employees about the possibility of getting overtime pay, and either the person did not know or said that he could not.  Doc. 99 at 36-37 (Owens Dep.).

When Plaintiff asked Ms. Olson in November 2015 whether he could get overtime pay, she told him that she could not grant that request but could "offer you some comp time or extra vacations days. I can also approve your vacation days to carry over into 2016."  Doc. 81-1 at 8-9 (Owens MSJ); Doc. 99 at 37 (Owens Dep.).  In April 2016, Defendant raised Plaintiff's annual pay to $86,275.00, noting that he was a salaried employee.  Doc. 99 at 53 (Deft. Compensation Information).   In January 2017, Ms. Olson became aware of irregularities in Plaintiff's expense reporting, and he was ultimately terminated for that reason.  Doc. 99 at 42-43 (Olson Decl.).  In the course of his termination proceedings, Defendant noted that Plaintiff was exempt from the FLSA.  Doc. 99 at 55 (Deft. termination form).

During his deposition, Plaintiff acknowledged that he received the same gross pay every week and whether he worked or took time off.  Doc. 99 at 12 (Owens Dep.).  Plaintiff said that the job posting for his position was not correct insofar as it classified the position as a "project leader," because he "did not have full autonomy and authority to delegate responsibilities of others as well as managing [his] own actions."  Doc. 99 at 14 (Owens Dep.).  He did, however, act as a trainer, facilitated workshops, and had a college degree and prior supervisory/management experience.  Doc. 99 at 14, 16 (Owens Dep.).  Plaintiff also testified that he was knowledgeable about various logistics methodologies, having spent 25 years in the industry.  Doc. 99 at 15 (Owens Dep.).   Moreover, Plaintiff obtained a certification which demonstrated his mastery of these principles after successfully completing an 80-hour curriculum, passing a comprehensive test, and demonstrating high-quality execution of three projects yielding positive performance results.  Doc. 99 at 41 (Olson Decl.).

Plaintiff testified that part of his job was to analyze the operations of various clients' facilities and determine how to improve those operations, including changing morale, and reducing safety problems and costs, with efficiency being a "byproduct" of that process.  Doc. 99 at 27 (Owens Dep.); *see also* Doc. 99 at 28 (Owens Dep.) (Plaintiff agreeing that his primary duties consisted of working with team members to improve operational standards and existing processes and involved in inspecting and auditing to determine if operational processes were in alignment with  prescribed . . . certification standards, procedures and guidelines which were very strict and detail oriented."); Doc. 99 at 30 (Owens Dep.) (Plaintiff testifying that his "primary duties consisted of working with team members to improve operational standards and existing processes").  In considering whether a particular client would be a good project for Defendant, Plaintiff would look at the compiled data and "let them know if this would make a good project," although the final decision was not up to him.  Doc. 99 at 29 (Owens Dep.).  Plaintiff also acknowledged that in training others, he selected which of Defendant's modules to use based on the nature of the job.  Doc. 99 at 31 (Owens Dep.).

Plaintiff also asserted that his job "required physical engagement to understand what people are doing."  Doc. 99 at 19 (Owens Dep.).  As an example, Plaintiff testified that if he was tasked with modifying a standard work document, he would watch employees throughout the day to observe their pace, which he timed, ask questions about what they were doing, and then physically do the work himself so he could understand the process.  Doc. 99 at 19-21 (Owens Dep.).  During and after that process, Plaintiff would gather data and document it in a flowchart, for example, and ultimately send out a final report and team reports.  Doc. 99 at 23-24 (Owens Dep.).  He described his job as "an auditor or inspector."  Doc. 99 at 23 (Owens Dep.).

When asked questions about his performance reviews during his tenure with Defendant, Plaintiff testified that he "pretty much" agreed with Ms. Olson's statements during his 2015 performance review that he sought creative ways to drive change and would "jump right in to thoroughly understand the root cause" of the issue and "identify improvement opportunities driving the company forward." Doc. 99 at 32 (Owens Dep.); Doc. 99 at 61 (2015 Perf. Rev.). Plaintiff also agreed with his previous self-assessment that, "in order to successfully complete a project, I've had to deeply indulge in identifying leadership and associate gaps" to mentor, train and teach team members. Doc. 99 at 32 (Owens Dep.); Doc. 99 at 61 (2015 Perf. Rev.). Plaintiff additionally agreed with Ms. Olson's assessment that:

(1) "[Plaintiff] has a passion for delivering results. He is open to taking on new challenges and jumps right in when asked to engage in a project/tasks. When presented the challenge of taking a facility to ISO certification within four months, [Plaintiff] quickly engaged with the team, including other business areas, to create a detailed action plan aligned to [a] 4 month time frame"[3]; and

(2) As [Plaintiff] engages in various activities, he continually looks for opportunities to improve processes and services to the operations in effect to help them optimize, achieve goals, and strive for continuous improvement."

Doc. 99 at 62 (2015 Perf. Rev.); Doc. 99 at 32-33 (Owens Dep.).

Plaintiff's testimony regarding his role with Defendant largely mirrors Ms. Olson's declaration. Therein, she attests that she previously worked in Plaintiff's position and, based on

---

[3] The project referenced involved a Mercedes Benz facility, during which Plaintiff prepared the facility for being audited, training, and conducting auditing and inspecting. When Plaintiff started work on the project, the facility was "way behind" on the integration of two different systems, and he was tasked with integrating the systems and ensuring compliance with both. Doc. 99 at 33 (Owens Dep.). Plaintiff testified that it was one of the largest facilities under Defendant's management and the job was a "pretty special" project and "a real challenge on a lot of fronts." Doc. 99 at 33-34 (Owens Dep.).

that experience, her (and Defendant's) expectation and knowledge was that:  (1) Plaintiff's

"primary duty was to analyze the operations of various facilities belonging to [Defendant's]

clients and determine how to improve those operations . . . by making them more efficient,"

enhancing cost-effectiveness, and reducing safety incidents; (2) Plaintiff would train employees,

lead workshops, lead audits, recommend process improvements, and assist with the

implementation of problem-solving methodologies; (3) Plaintiff's work also involved audits and

quality control; (4) Plaintiff would rely on his experience and exercise his judgment in deciding

the best way to improve client operations and processes; (5) Plaintiff "managed large,

complicated projects with very little day-to-day oversight" and acted as a "point person" on those

projects, updating Olson on a weekly basis; (6) as a project manager, Plaintiff "had substantial

control over the improvement of operations of the facilities to which he was assigned," and he

was expected to exercise that control and "run the projects"; and (7) Plaintiff would occasionally

perform manual tasks as part of his inquiry into how a facility worked and how it could improve,

but those tasks were collateral to his primary duty of making the facility more efficient.  Doc. 99

at 41-42 (Olson Decl.).

The other evidence of record also supports Ms. Olson's statements regarding the nature

of Plaintiff's work.  *See* Doc. 99 at 61 (2015 Perf. Rev.) (stating that, "depending on the needs of

the project, [Plaintiff] can effectively play the role of both an executor and a mentor.  His

experience allows him the ability to make decisions and set priorities that align to the project

team needs and overall goals."); Doc. 99 at 62 (2015 Perf. Rev.) (stating that when tasked with

the challenge on the Mercedes Benz job site, Plaintiff "quickly developed a solid action plan,"

and his dedication to the team allowed him to effectively lead execution efforts, such that the

facility received the necessary certification "in record time."); Doc. 99 at 64 (2015 Perf. Rev.)

6

(Plaintiff stating that his target was to "[l]ead high-quality, strategically-aligned projects that have a sustainable impact on [his] department's business results."); Doc. 99 at 64 (2015 Perf. Rev) (noting Plaintiff's list of the 12 projects he had completed in 2014, in which he referred to himself as a "project leader" for seven of those projects); Doc. 99 at 68 (2016 Perf. Rev.) (Plaintiff stating that based on his success and improvement in, *inter alia*, project completion, his influence had "a relatively significant impact on those around me and the environment."); Doc. 99 at 69 (2016 Perf. Rev.) (Plaintiff stating that he "drove teams" to be informed regarding performance goals and "held teams accountable and on track."); Doc. 99 at 70 (2016 Perf. Rev.) (supervisor noting that Plaintiff "led improvement projects" at various facilities.); Doc. 99 at 72 (2016 Perf. Rev.) (Plaintiff listing ten of his 2015 accomplishments and identifying himself as a project manager on five of those jobs); and Doc. 99 at 77 (Plaintiff's September 2016 email to supervisor stating that, "[a]s the project leader, I am entitled to the freedom and latitude of determining what projects I select to use . . .").

## C. Applicable Law

### 1. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party moving for summary judgment has the initial burden of  "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Once the

moving party has properly supported its motion for summary judgment, the burden shifts to the

nonmoving party to "come forward with specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(internal quotes omitted).  "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.* (citation omitted).

Nevertheless, when ruling on a motion for summary judgment, the court is required to view all

facts and inferences in the light most favorable to the nonmoving party and resolve all disputed

facts in favor of the nonmoving party.  *Id.*  "A fact is 'material' if its resolution in favor of one

party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star*

*State of Texas*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).

   *2.  FLSA*

   The FLSA requires an employer to pay overtime compensation to employees who work

more than 40 hours per week at a rate of at least one and one-half times the employee's regular

rate.  29 U.S.C. § 207(a)(1).  The FLSA does, however, include a number of exemptions to this

requirement.  As relevant here, workers employed in bona fide administrative capacities are

exempt from the FLSA's overtime requirements.  *See* 29 U.S.C. § 213(a)(1) (exempting from §

207 "any employee employed in a bona fide executive, administrative, or professional

capacity").

   "[T]he ultimate determination of whether an employer qualifies for an exemption under

the FLSA is a question of law." *Singer v. City of Waco, Texas*, 324 F.3d 813, 818 (5th Cir.

2003) (citations omitted).  "That ultimate determination, however, relies on many factual

determinations that can be resolved by a jury." *Id.* "The Supreme Court recently clarified that

courts are to give FLSA exemptions 'a fair reading,' as opposed to the narrow interpretation

previously espoused by this and other circuits." *Carley v. Crest Pumping Tech., LLC*, 890 F.3d 575, 579 (5th Cir. 2018) (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

A plaintiff bears the initial burden of proving that they were covered under the FLSA's overtime pay requirement. *Id.* (citation omitted). An employer claiming that an employee is exempt from this provision then bears the burden of proving that the exemption applies. *Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999). In the case at bar, Defendant argues that it need not pay Plaintiff overtime because he is subject to the FLSA's "administrative" work exemption. An employee in an administrative capacity is one:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

*Dewan v. M-I, LLC*, 858 F.3d 331, 334 (5th Cir. 2017) (quoting 29 C.F.R. § 541.200).

The term "primary duty" means "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Factors to consider when determining the primary duty of an employee include, but are not limited to, (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; and (3) the employee's relative freedom from direct supervision." 29 C.F.R. § 541.700(a).

**D.  Parties' Arguments and Analysis**[4]

    *1. Compensation*

    As an initial matter, there is no dispute that Plaintiff was compensated by a salary that was well over $455 per week.  Moreover, the parties agree that Plaintiff has established a prima facie case of an FLSA violation.  Doc. 81 at 6-7; Doc. 81-2 (spreadsheet of overtime hours worked); Doc. 87 at 12.  As such, the Court limits its analysis to whether Plaintiff is exempt from the FLSA because he served as an administrative employee.[5]

    *2. Whether Plaintiff's Primary Duty Directly Relates to the Management or General Business Operations of Either Defendant or its Customers*

    Defendant asserts that Plaintiff's primary duty was non-manual work directly related to the management or general business operations of Defendant and its customers.  Doc. 87 at 14.  Specifically, Defendant asserts that Plaintiff's primary duty was to analyze the operations of various facilities of Defendant's clients to determine how those operations could be improved and made more efficient.  Doc. 87 at 14; Doc. 98 at 10.  Those improvements would then be implemented through training, workshops, audits, recommendations, and assisting with the implementation of problem-solving methodologies.  Doc. 87 at 16; Doc. 98 at 10-13.  As such, Plaintiff acted as a type of "efficiency consultant" to Defendant's customers, and any physical work he performed in that context was to understand the clients' work processes so he could

---

[4]  Because the parties filed cross-motions for summary judgment, their arguments are consolidated to the extent possible.

[5] Although Plaintiff argues that Defendant did not raise any affirmative defenses, Doc. 81-1 at 14-15, Defendant asserted ten affirmative defenses in its Answer, Doc. 40 at 8-9, which was not untimely as Plaintiff maintains.

optimize their operations.  Doc. 87 at 16; Doc. 98 at 10-11, 19 (citing *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 519 (6th Cir. 2004) for the proposition that while the plaintiff may have performed manual work on occasion to evaluate operational problems and inefficiencies, such work was a merely a "collateral task" that was in furtherance of his primary duty as a project leader analyzing and improving processes).

Plaintiff asserts that his primary duty was not "administrative" because he was rarely at his office and spent almost all of his time traveling and in the field.  Doc. 105 at 18 ("Plaintiff's work was not conducted in the office the majority of the time and was, therefore, manual.").  Plaintiff next asserts that he worked on Defendant's "production side" and therefore was not exempt from the FLSA.  Doc. 105 at 19-20.  Specifically, Plaintiff argues that he "was primarily engaged in generating the product (parts/tangible goods) and providing the service (warehouse storage/distribution)."[6]  Doc. 105 at 20.

The phrase "directly related to the management or general business operations" refers to the nature of the work the employee performs.  To meet this requirement, an employee must perform work directly related to assisting with the running of the business and includes, *inter alia*, work in functional areas such as auditing, quality control, and research.  29 C.F.R. § 541.201(b); *Snively v. Peak Pressure Control, LLC*, 317 F. Supp. 3d 911, 915 (W.D. Tex. 2018).  That is to be "distinguished, for example, from working on a manufacturing production line or

_____

[6] Although Defendant correctly argues that Plaintiff filed his summary judgment response at least a day late, Doc. 107 at 2, due to Plaintiff's status as a *pro se* litigant, the Court will afford him some leniency on this point and address the claims on the merits.  The Court also notes Defendant's argument that Plaintiff submitted numerous unauthenticated documents with his response.  Even considering those documents, however, they do not change the Court's determination.

selling a product in a retail or service establishment."  *Masterson v. Tucker Energy Servs., Inc.*, No. SA-16-CA-749-OLG-(HJB), 2018 WL 5733188, at *6 (W.D. Tex. Aug. 28, 2018) (quoting 29 C.F.R. § 541.201(a)).

Plaintiff likens himself to an employee "working on a manufacturing production line" or "selling a product in a . . . service establishment," Doc. 105 at 20, but his argument is undermined by his own testimony.  *See* Doc. 99 at 28 (Owens Dep.) (Plaintiff answering affirmatively when asked whether his "primary duties consisted mainly of working with team members to improve operational standards and existing processes . . ."); Doc. 99 at 30 (same) (Owens Dep.).  Other evidence of record also underscores Defendant's position.  *See* Doc. 99 at 41-42 (Olson Decl.) (attesting that Plaintiff's "primary duty was to analyze the operations of various facilities belonging to [Defendant's] clients and determine how to improve those operations . . . by making them more efficient," enhancing cost-effectiveness, and reducing safety incidents); *see also* Doc. 81-4 at 1-3 (affidavit of Stefanos Pontikis, a former employee of Defendant, stating that Plaintiff "physically engaged in work activities to understand the [work] process," but his "primary duties" involved "working with team members to improve operational standards and existing processes" at facilities); Doc. 81-5 at 1-2 (affidavit of Robin Lyons, another former co-worker) (stating that Plaintiff's "primary duties" consisted of working with team members to improve operational standards and existing processes and involved inspecting and auditing to determine if operational process were in alignment with prescribed certification standards and procedures).  Thus, the Court concludes that Plaintiff's primary duty was to analyze the operations of the facilities of Defendant's clients and improve their operations by training, workshops, audits, recommending improvements, and assisting with the implementation of problem-solving methodologies.

As noted above, Plaintiff's work with Defendant's clients involved, among other things, audits and quality control.  Such activities constitute "[w]ork directly related to management or general business operations," which qualifies as exempt work.  29 C.F.R. § 541.201(b); *Snively*, 317 F. Supp. 3d at 915; *Carbaugh v. Unisoft Int'l, Inc.*, No. H-10-0670, 2011 WL 5553724, at *23 (S.D. Tex. Nov. 15, 2011) (applying administrative exemption to employee who "had to identify the customers' needs, translate them into specifications to be implemented, and assist in the implementation," which involved the plaintiff having to spend much of his time away from his employer's offices); *see also York v. City of Wichita Falls*, 944 F.2d 236, 242 (5th Cir. 1991) (holding that the fact than an employee may spend a significant portion of his time engaged in ministerial or routine tasks did not foreclose the employee from qualifying as a bona fide executive subject to the FLSA's executive exemption).

Ironically, Plaintiff's version of the material facts, as relevant here, actually tend to support Defendant's position that Plaintiff played a key role with the company.  *See e.g.*, Doc. 81-1 at 7-8 (Plaintiff stating that he had to work overtime "to create a training plan" due to other personnel not having the necessary training); Doc. 81-1 at 8 (stating that the Mercedes Benz facility was the main priority in 2015, it was a "massive undertaking," and he was the only employee who had the necessary experience with the certification process to "make a miracle happen"); Doc. 81-1 at 9 (noting that Defendant knew he was working off-the-clock "based on the nature and substantive importance of the projects Plaintiff had to complete"); Doc. 81-1 at 9 (plaintiff was "challenged with supporting the more stressed facilities more than any other team member" for the entirety of his employment); Doc. 81-2 at 14 (email from Plaintiff stating that he typically spent a few hours a night working because he had "multiple projects [to] run/manage."); Doc. 99 at 68 (2016 Perf. Rev.) (Plaintiff stating that based on his success and

improvement in, *inter alia*, project completion, his influence had "a relatively significant impact on those around me and the environment.").  Moreover, Plaintiff traveled around the country extensively for work, which would not likely be the case if his primary responsibility was performing manual work once he arrived.  Doc. 81-2 at 4-5, 17-18.[7]

    3. *Whether Plaintiff's Primary Duty Included the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance*

    Turning to the last requirement for the administrative exemption, Plaintiff alleges that he did not have the authority to hire, fire, promote, or discipline any employee and did not manage an enterprise or department or regularly direct the activities of two or more full-time employees. Doc. 81-1 at 19.  Moreover, Plaintiff claims that his role was defined and controlled by carefully prescribed parameters, and his inspection work did not qualify him under the administrative exemption.  Doc. 105 at 13.  In short, Plaintiff contends that the regulations clearly distinguish discretion and independent judgment from "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  Doc. 105 at 13 (quoting 29 C.F.R. § 541.202(e)).  Thus, he claims that his performance of mechanical,

---

[7] Alternate grounds also support the Court's decision that Plaintiff was an exempt employee.  To wit, employees acting as advisers or consultants to their employer's clients or customers, such as tax experts or financial consultants, may be exempt if their advice to their employer's customers regards "matters that involve policy determinations, i.e., how a business should be run or run more efficiently."  *Dewan*, 858 F.3d at 337 (quoting U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997)); *see* 29 C.F.R. §541.201(c).  Because Plaintiff's job involved determining how to make Defendant's customers' businesses run more efficiently, he can properly be designated as an adviser/consultant, and is thus exempt under that measure as well. *Dewan*, 858 F.3d at 337.

repetitive, recurrent, or routine work does not reflect the exercise of discretion and independent judgment. Doc. 105 at 13.

Defendant argues that Plaintiff exercised discretion and independent judgment with respect to significant matters, including by using his experience and judgment to determine how best to increase efficiency at a given facility by observing the work process, deciding which methodologies or tools would improve the process, and applying them through teaching and training. Doc. 87 at 17-18. Additionally, Defendant contends that Plaintiff exercised his discretion and independent judgment with little oversight by (1) creatively applying the methodologies and tools he selected to resolve problems; (2) managing major projects, such as the Mercedes Benz project; (3) conducting audits; (4) scheduling daily and training schedules in coordination with the facilities' management; and (5) selecting training materials and leading the sessions among other duties. Doc. 98 at 23-28.

The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The fact that an employee must follow standard procedures and guidelines does not indicate the lack of professional discretion and judgment. Owsley v. San Antonio Indep. Sch. Dist., 187 F.3d 521, 526 (5th Cir. 1999) (holding that athletic trainers fall within the administrative exemption because they operate independently when assessing an athlete's injury and deciding whether the athlete should seek further medical attention, sit out the remainder of practice or a game, or continue athletic activity).

Notably, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed a higher level." 29 C.F.R. § 541.202(c). In accord,

the Court of Appels for the Fifth Circuit has held that the exercise of discretion and judgment need not be final decision-making authority. *Lott v. Howard Wilson Chrysler-Plymouth, Inc.,* 203 F.3d 326, 331 (5th Cir. 2000). A consultant acts with discretion and independent judgment when he "has made a study of the operations of a business and . . . has drawn a proposed change in organization [and has] the plan reviewed or revised by superiors before it is submitted to the client." 29 C.F.R. § 541.202(c).

Moreover, even if Plaintiff worked with a standard "toolbox" of continuous-improvement methodologies, he still exercised his independent judgment in determining which methodologies to use in each circumstance, as well as when and how to use them. Doc. 99 at 31 (Owens Dep.). Plaintiff himself has stated that he worked on difficult, important projects, including "making a miracle happen" during the Mercedes Benz project. Doc. 81-1 at 8. As he himself wrote, "[a]s the project leader, I am entitled to the freedom and latitude of determining what projects I select to use." Doc. 99 at 77.

Plaintiff's independence is further underscored by the fact that he had little oversight from his supervisors, who were rarely on site. Doc. 99 at 17-18 (Owens Dep.); Doc. 99 at 41-42 (Olson Decl.). Indeed, his supervisors expected him to be the "point person" for the projects to which he was assigned and to manage those projects. Doc. 99 at 42 (Olson Decl.). Finally, Plaintiff's role in managing these projects was important to Defendant and its operations. Doc. 99 at 61 (noting that Plaintiff's work "dr[ove] the company forward"); see also Doc. 99 at 32 (Owens Dep.) (agreeing with evaluation); Doc. 99 at 70 (2016 Perf. Rev.) (stating that Plaintiff led various improvement projects"); Doc. 99 at 68 (2016 Perf. Rev.) (Plaintiff stating that based on his success and improvement in, *inter alia*, project completion, his influence had "a relatively significant impact on those around me and the environment.")).

Accordingly, judgment should be entered in Defendant's favor.

**E.  Conclusion**

For the foregoing reasons, Plaintiff's summary judgment motion, Doc. 81, should be

**DENIED**, and Defendant's summary judgment motion, Doc. 97, should be **GRANTED.**

**SO RECOMMENDED** on March 14, 2019.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).